The opinion of the Court was delivered by
"Wardlaw, A. J.
The decree of the Chancellor is satisfactory to this Court, and very little will be added to the observations he has made.
The dates of the various occurrences may be seen at one view, as follows:
Order of Chancellor Wardlaw, . . Jan. 22, 1859.
Sale b'y Mr. Gray, . . . . ■ Jan. 3,1860.
Beport of sales,.....March, 1860.
Bond and mortgage by Mr. Lynah, . Jan. 1860.
Whereon instalments became due, Jan. 1861, ’62, and ’63. Payment of interest by Mr. Lynah, Eeb. or April, 1861.
Death of Mrs. McPherson, at a very great age, whereupon the rights of the complainants to immediate enjoyment became complete. . . Fall, 1863.
*129 Payment of principal by Mr. Lynah, . Jan. 30,1864.
Conversation between Chancellor Inglis and Mr. Gray, . . . Eeb. 1864.
Payment of balance, being interest by Mr. Lynah, .... March 11,1864.
The bill in this case filed, . . . March 31,1866.
The order of Chancellor Wardlaw, was made in the case of Coffin vs. McPherson, a creditors’ bill, under which debts against the testator, Col. McPherson were to be paid. The order recites " the acquiescence of all the parties, who are directly interested in the sale proposed by the tenant for life, in connection with the fact that such sale must necessarily take place at no distant clay, as well for partition as the payment of debts,” and also “ the application of the solicitors who represent both plaintiff and defendants,” and directs the sale by Mr. Gray, one of the masters of the Court, of the estate of Col. McPherson with some exceptions; further “ that out of the proceeds of sale the debts of the testator be paid, and the residue, subject to the trust of the testator’s will, to abide the future order of the Court.” The report of sales shows that Mr. Gray sold to various purchasers three plantations besides Vernersobre, and many slaves and much other personalty, in the whole amounting to more than $180,000. The residue was the residue of proceeds, and the proceeds must, for payment of debts, have been intended to be cash obtained by the Commissioner from bonds. Not intending in the least to indicate the opinion of the Court, concerning suits commenced, or even payment demanded by the master without the order of the Court, we see in the order which we have cited a justification for Mr. Gray’s receiving payment of Mr. Lynah’s bond, whenever the latter chose to exercise the right of paying it.
But the payment was not, it is said, a payment — it was but the delivery of Confederate treasury notes, which were then *130 far below their nominal value, and since have become worthless. On this head, the defendants have referred to the Act of December, 1861, (13 Stat. 87,) which authorizes trustees, &c., to invest funds in bonds of the Confederate States; but the Act is inapplicable to the case, for here were no funds held in trust for investment and no bonds into which other securities had been changed. Mr. Gray was a trustee, and Mr. Lynah knew at least for what estate the bond was given, and so far may be said to have been constructively a trustee for those who were entitled to its proceeds. The defence of both in the transaction, whereby the bond vas converted into Confederate treasury notes, has been properly placed by the Chancellor upon their good faith and the state of the times. These treasury notes were not as said, even in form valid promissory notes; but they constituted the whole currency of the country, passed as money, were received by prudent men, and paid by the other debtors of McPherson’s estate. They were not equivalent to gold and silver, but they supplied the place of gold and silver; they were not in fact compared with specie, for of that there was none; nor were they expected to be immediately convertible into something of universal acceptance, but were sustained in credit by the expectation of their becoming redeemable in future, and by the sheer necessity which every one felt of their being some acknowledged representation of value. It is, as the Chancellor has intimated, difficult to recall precisely the state of affairs in the beginning of 1864 ; but very many now feel the consequences of their then selling valuable property for this money, now despised, but then eagerly sought. It would be unjust to exact from Mr. Gray more than the same care, diligence and caution, which a prudent man would employ in the management of his own funds. Not one of the complainants was in or near the city — the principal was accepted before Chancellor Inglis’ advice *131 was given, and that was but the opinion of a discreet friend, and no material change in political prospects, nor, as we may suppose, in the credit of treasury notes, took place before the interest was paid. Mr. Lynah is understood to have acted with perfect fairness throughout, and, it would be impossible now to do what the plaintiffs ask in reference to him : restore the parties to the condition they were in when the bond was delivered to be cancelled. We cannot now restore the value which treasury notes, and the land for which the bond was given, then had.
The contract has been executed, and this without evil purpose or violation of duty on either side. To re-open it would transfer a loss from those upon whom it has fallen to another sufferer not less entitled to consideration, and the establishment of a rule which would permit this, might work mischief to an appalling extent.
The decree is affirmed.
Dunkin, C. J., and Glover, J., concurred.

Decree affirmed.